## APPEAL OF SEABOARD MILLS, INC., (FLEITMANN & CO., INC., SUCCESSOR).

Docket No. 5499. Decided November 20, 1926.

Petitioner was not during the year 1918 a personal service corporation.

*Richard E. Dwight, Esq.*, and *Jacob G. Schurman, Jr., Esq.*, for the petitioner.

*J. Arthur Adams, Esq.*, for the Commissioner.

This is an appeal from the determination of a deficiency in income and profits taxes for the calendar year 1918, in the amount of $51,318.40, arising from the refusal of the Commissioner to classify the petitioner as a personal service corporation and from the increase by him of the net income for the year in the amount of $3,799.21, upon the ground that this amount, representing income and profits taxes for the year 1917, was deducted from 1918 income.

### FINDINGS OF FACT.

The petitioner was incorporated October 27, 1914, under the laws of New York, to engage in business as selling agent for various cotton mills. In 1914, Fleitmann & Co., a partnership, was engaged in business as factors and commission merchants. In such capacity it made advances against merchandise to various mills for which it acted as sales agent. It had about twenty different departments, including a sales force engaged in selling the product of the various cotton mills and designated as the Cotton Department. One Richardson and one Baldwin were employed as salesmen in this department. In 1914 the partnership was compelled to discontinue acting as factor and sales agent and this left the various mills, the sale of the products of which Henry C. Fleitmann, one of the partners, controlled, without a factor to finance their operation and without a sales agent. Thereupon, Henry C. Fleitmann, one of the partners who held contracts with the various cotton mills for the sale of their entire output, entered into negotiations with the firm of L. F. Dommerich & Co. and induced that firm to act as factor for the mills. L. F. Dommerich & Co. agreed to the proposition but refused to have anything whatever to do with the selling of the goods produced by these mills. It was stipulated as a condition precedent to its undertaking to act as factor that Henry C. Fleitmann should have entire charge of the sale of the products of the mills which it represented. Fleitmann agreed to this condition, and in order to carry out the agreement organized the petitioner to act as sales agent.

About November 1, 1914, the various cotton mills which Fleitmann & Co. had theretofore represented entered into contracts with L. F. Dommerich & Co. of equal import. The contract with the Union Buffalo Mills Co. provided, in part, as follows:

The Union-Buffalo Mills Co. will discount with and assign or cause to be assigned to L. F. Dommerich & Co. all the accounts arising from the sale of its entire product from and after the 1st day of November, 1914; the sales are to be made by its own selling agent or agents. All expenses necessary for the business shall be borne by the Union-Buffalo Mills Co., or its selling agent or agents, including the billing and delivery of the goods, and L. F. Dommerich & Co. shall be under no expense except their own office and assume no responsibility or obligation except as hereinafter stated.

The Union-Buffalo Mills Co. will duly assign or cause to be assigned all accounts which it renders to its customers to L. F. Dommerich & Co., such assignments to be made on a form acceptable to L. F. Dommerich & Co. All bills are to be sent to L. F. Dommerich & Co. for transmission to the customers. L. F. Dommerich & Co. will discount these bills to the Union-Buffalo Mills Co. monthly and make remittances monthly or, if required, oftener, after the goods have been delivered to and accepted by the customers.

The Union-Buffalo Mills Co. agrees to allow L. F. Dommerich & Co. to retain, when remitting against these bills, an amount commensurate with the volume of business done to cover L. F. Dommerich & Co. against returns, claims, etc. All claims and returns shall be reported to L. F. Dommerich & Co. at once and are to be charged to the Union-Buffalo Mills Co. immediately and all payments made by L. F. Dommerich & Co. thereon shall be refunded to this firm upon demand and the amount of any such claims or of any deductions upon account thereof, made by customers from any payments due L. F. Dommerich & Co. may be deducted by L. F. Dommerich & Co. from subsequent remittances to be made by them to the Union-Buffalo Mills Co. but L. F. Dommerich & Co., (unless it be required for their own protection) shall pass no credits to customers for claims, deductions, returns, etc., without the instructions therefor from the Union-Buffalo Mills Co. The Union-Buffalo Mills Co. will attend to the settlement of all disputes with and claims of customers without expense to L. F. Dommerich & Co. All proposed sales shall be submitted to L. F. Dommerich & Co. and shall not be made unless L. F. Dommerich & Co. approve them in writing, in which case L. F. Dommerich & Co. guarantee to the Union-Buffalo Mills Co. the proceeds thereof after the goods have been delivered to and finally accepted by the customers as to price, terms and quality.

\*       \*       \*       \*       \*       \*       \*

L. F. Dommerich & Co. will charge on the 15th of the month in which the sales are made a commission of 4% on the amount of all sales for their services and the services of the selling agents of the Union-Buffalo Mills Co. L. F. Dommerich & Co. will render accounts current semi-annually, in which the interest is figured at the rate of six per cent (6%) per annum, pro and con.

L. F. Dommerich & Co. agree to loan and advance to the Union-Buffalo Mills Co. in addition to the payments against sales, as provided for in paragraph 3, an amount not over $1,025,000. on open account at any time, but L. F. Dommerich & Co. shall not be required to make such loans or advances to the Union-Buffalo Mills Co. in excess of $160,000. per month but, however, should the sales be less, in any one year ending October 31 than $2,800,000, then L. F. Dommerich & Co. shall only be required to advance during the

following year 10/28 of the previous year's sales and the amount required each month by the Union-Buffalo Mills Co. shall be reduced proportionately.

The Union-Buffalo Mills Co. agrees that they will not borrow from any banks or anyone other than L. F. Dommerich & Co. for any purpose other than legitimate business and that they will not give security other than cotton purchased in excess of approximately a month's supply, for any outside loans without the consent of L. F. Dommerich & Co. and that their liabilities will not be increased to the detriment of L. F. Dommerich & Co.; it being understood and agreed that the net debts of the Union-Buffalo Mills Co. shall not be increased. L. F. Dommerich & Co. shall not be compelled to make advances to the Union-Buffalo Mills Co. if the condition of the money market in New York City makes it impossible for them to procure the funds.

On October 23, 1914, L. F. Dommerich & Co. wrote the petitioner as follows:

We beg to inform you herewith that we have to-day entered into contracts with the following companies, for the financing of their business:

> Union Buffalo Mills Co.
> Fairmont Manufacturing Co.
> Courtenay Mfg. Co.
> Warren Mfg. Co.
> Orangeburg Mfg. Co.
> Bamberg Cotton Mills Co.

In consideration of these arrangements we shall pay to you, for the account of each manufacturer, out of the commission collected by us covering your and our services, a commission of 1¾% on all sales made by you, except for the account of the Warren Mfg. Co., on whose sales we are to pay you one %.

You are to act as selling agents for these companies and, as such, assume all responsibilities for the sales towards the manufacturers.

You may obtain additional agencies for other companies if they are acceptable to us.

All sales which you make must be made payable to us and cannot be made unless our credit office approves their terms and amounts.

This understanding is to continue until November 1st, 1919. Either party shall have the right to terminate it on six months prior written notice at any time on or after November 1st, 1916.

Kindly acknowledge receipt of this communication, thereby accepting all conditions contained therein.

Upon its organization the petitioner acquired the selling contracts held by Fleitmann & Co. with the Union-Buffalo Mills Co., Fairmont Manufacturing Co., Bamberg Manufacturing Co., Orangeburg Manufacturing Co., Warren Manufacturing Co. and the Santee Mills Co., which was the successor to the Orangeburg Manufacturing Co. In exchange for these contracts the petitioner issued to Henry C. Fleitmann and those persons designated by him its capital stock of the par value of $75,000. Additional stock of the par value of $25,000 was issued for cash, making the total outstanding capital stock of the petitioner $100,000, which remained in that amount throughout the taxable year 1918.

Between October 27 and November 2, 1914, the above mentioned mills, with the exception of the Santee Mills, which continued its contract verbally, wrote the petitioner as follows:

As you know, we have entered into a contract with Messrs. L. F. Dommerich & Co. providing that for the term of the contract our product is to be sold by selling agents, subject to the approval of Dommerich & Co., and the accounts resulting therefrom are to be assigned to L. F. Dommerich & Co. and guaranteed and accounted for by them. This contract is to continue from November 1st, 1914 to November 1st, 1916, and thereafter subject to termination on six months' written notice.

We confirm our understanding with you that for the term of this contract you are to act as our selling agents for the entire product of our mills, the sales to be subject to the approval of L. F. Dommerich & Co., and that you are on our behalf to assign the accounts to them and bill the goods through them upon forms which they may approve, the bills to be handed to them for transmission to customers in accordance with our agreement. Consignment invoices of the goods will be sent to you as well as customers' receipts and shipping documents, the latter to be transmitted by you to Messrs. L. F. Dommerich & Co., and it is understood that you are to act for us in adjusting disputes with customers regarding claims, rejections, returns, cancellations, etc., and are to advise Messrs. L. F. Dommerich & Co. of any such adjustment.

It is understood that all selling expenses, which in the conduct of the business heretofore through Fleitmann & Co.'s cotton department have been borne by them, shall be borne by you with the exception of such part thereof as Messrs. L. F. Dommerich & Co. under their agreement with us may bear, and to cover your expenses and for your compensation you are to receive such part of the gross commission of four per cent (4%) on all sales charged by Messrs. L. F. Dommerich & Co. under their agreement with us as you may agree upon with them.

This agreement is to continue until November 1st, 1916, and thereafter from year to year subject to termination on six months' written notice.

If this is in accordance with your understanding kindly confirm the same.

At the time the petitioner acquired the selling agency of Fleitmann & Co., Richardson and Baldwin were under contract with it for services and the petitioner, as the successor of Fleitmann & Co., paid to them $10,000 each in consideration of the cancellation of the existing contracts.

During the year 1918 the capital stock of the petitioner was owned by Henry C. Fleitmann, president, in the amount of $60,000, Frank E. Whitman, treasurer, in the amount of $20,000, and Ellroy Curtis, secretary and salesman, in the amount of $20,000. Each of the stockholders was regularly engaged in the active conduct of the affairs of the corporation. In addition to the stockholders, the petitioner employed two clerks who assisted in the sale of the product of the various mills termed "seconds," a telephone operator, two stenographers, an order clerk, a stock-book clerk, a sales clerk, an office boy, and a porter.

As selling agent the petitioner sold the product of the cotton mills hereinbefore mentioned, advising such mills with respect to the

most favorable time to sell their finished product or surplus raw materials and as to the most propitious time to purchase additional raw materials for future use. It secured for certain mills contracts for future deliveries and conferred from time to time with the factor, L. F. Dommerich & Co., concerning the progress and financial requirements of the various mills. All sales were made under the direct supervision of the officers and the stockholders, and were in the total amounts following:

| | |
|---|---|
| Union-Buffalo Mills Co | $6, 857, 447. 32 |
| Fairmont Manufacturing Co | 597, 894. 59 |
| Warren Manufacturing Co | 1, 168, 685. 68 |
| Santee Mills | 663, 882. 62 |
| Bamberg Manufacturing Co | 363, 719. 73 |
| Total | 9, 651, 629. 94 |

Of the above amount, $4,727,327.44 represented sales made direct and $4,924,357.14 represented sales made through brokers, as hereinafter mentioned.

Ninety-five per cent of the total sales during the year were made by the stockholders, the remaining 5 per cent of sales, representing the product of various mills termed "seconds," were made to the East Side New York trade by the two clerks employed by the petitioner, under the direct supervision of the stockholders. Although Fleitmann did not actually go out and take orders, he was the managing head of the business and a greater portion of the income was due to his activities. He supervised all sales and his judgment in all matters affecting the company was controlling.

A little over one-half of the total sales represented the product of the mills sold by the stockholders of the petitioner through brokers who controlled purchases of this character by certain dealers. In cases where orders were secured by the petitioner through brokers, such brokers acted for and represented the buyers and, pursuant to trade custom, their commissions were paid by the mill making the sale and were deducted from the commission to which the petitioner was entitled upon the sale. The brokers were not at any time in the employ of the petitioner.

In 1918 the petitioner held as investments, which were not used or employed in its business, the following securities: Liberty bonds in the amount of $7,400 at the beginning of the year and in the amount of $102,000 at the end of the year, 780 shares of the capital stock of the Santee Mills and 1,100 shares of the capital stock of the Warren Manufacturing Co. The 1,100 shares of stock of the latter company were purchased sometime between 1918 and sold in the same year at a net profit of $20,000.

The gross income of the petitioner for the year 1918 was $174,862.12. Eighty-four per cent of this amount, or $146,552.07,

represented commissions on sales, 11½ per cent, or $20,000, represented the profit upon the sale in 1918 of the stock of the Warren Manufacturing Co. acquired in the same year, and 4½ per cent, or $8,309.05, represented dividends received upon the stock of other corporations and Liberty bond interest.

The balance sheet of the petitioner at the beginning and end of the year 1918 was as follows:

| | Dec. 31, 1917. | | Dec. 31, 1918. | |
|---|---|---|---|---|
| **ASSETS.** | | | | |
| Cash in banks and on hand | | $6,846.85 | | $4,015.04 |
| Accounts receivable: | | | | |
| L. F. Dommerich & Co | $8,111.89 | | $13,515.86 | |
| H. C. Fleitmann-Loan | 44,000.00 | | 24,000.00 | |
| H. B. Jennings-Loan | 2,000.00 | | | |
| Due from employees on Liberty bond subscriptions | 1,801.00 | | | |
| | | 55,912.89 | | 37,515.86 |
| Investments: | | | | |
| In stock of Santee Mills (780 shares) | 72,586.74 | | 72,586.74 | |
| In United States Liberty loans | 7,400.00 | | 102,995.29 | |
| In war savings stamps | | | 846.00 | |
| | | 79,986.74 | | 176,428.03 |
| Furniture and fixtures | | 590.58 | | 524.96 |
| Contracts, good will, etc | | 75,000.00 | | 75,000.00 |
| | | 218,337.06 | | 293,483.89 |
| **LIABILITIES AND CAPITAL.** | | | | |
| Notes payable: | | | | |
| Lincoln Trust Co | 25,000.00 | | 27,000.00 | |
| Fleitmann & Co | 36,000.00 | | | |
| | | 61,000.00 | | 27,000.00 |
| Liberty bonds unpaid subscriptions | | 4,000.00 | | 15,000.00 |
| Accounts payable: | | | | |
| Brokerage | 2,859.45 | | 470.24 | |
| Legal fees | 500.00 | | | |
| Miscellaneous | 358.04 | | 350.74 | |
| | | 3,717.49 | | 820.98 |
| Accrued salaries | | 20,000.00 | | 40,000.00 |
| Reserve for Federal income and excess profits taxes | | 6,907.28 | | |
| Capital | | 100,000.00 | | 100,000.00 |
| Surplus: | | | | |
| Profit and loss | 22,712.29 | | 84,842.55 | |
| Surplus | | | 25,820.36 | |
| | | 22,712.29 | | 110,662.91 |
| | | 218,337.06 | | 293,483.89 |

The accounts receivable represent loans made by the petitioner to the persons named. Henry C. Fleitmann was the president and the largest stockholder of the petitioner and president of the Union-Buffalo Mills Co.; H. B. Jennings was superintendent of the Union-Buffalo Mills Co. Notes payable to the Lincoln Trust Co. and Fleitmann & Co. represented money borrowed by the petitioner with which to purchase stock of the other corporations.

The Commissioner increased the net income for 1918 in the amount of $3,799.21, representing income and profits taxes for the year 1917 claimed to have been taken as a deduction by the petitioner in computing its taxable net income.

On June 7, 1918, this amount of $3,799.21 was charged to profit and loss account on the books of the petitioner, and on the same date

a contra-entry was made in a similar amount transferring this charge to the tax account, a reserve account set up on the books in 1917. A reconciliation of the surplus account, as shown by the books for 1918, shows that the net income as reported in the tax return did not include any deduction for the preceding year's taxes.

### OPINION.

LITTLETON: The petitioner contends that its income for the year 1918 was due primarily to activities of its stockholders; that it was not engaged in trading as a principal; and that capital was not used in the business and was not a material income-producing factor.

All of the stockholders were regularly engaged in the active conduct of the affairs of the corporation and 84 per cent of the gross income may be ascribed primarily to their activities. It was not engaged in trading as a principal, but it appears that a portion of its income was produced by capital. Section 200 of the Revenue Act of 1918 provides that the term " personal service corporation " means a corporation in which capital (whether invested or borrowed) is not a material income-producing factor. It appears, as the findings of fact show, that 16 per cent of the petitioner's gross income was produced by capital, invested or borrowed, and from the sale of stock of another corporation purchased within the year. The statute provides that before a corporation is entitled to classification as a personal service corporation its income must be ascribed primarily to the activities of the principal owners or stockholders, and as was said by the court in the case of *Matteson Co.* v. *Willcuts,* 12 Fed. (2d) 447:

> Any corporation claiming to be a personal service corporation must bring itself fairly within the requirements of such an organization, as provided by law. Every corporation has full control of its own activities. It knows what the requirements of a personal service corporation are. It may comply therewith and easily keep within the limits thereof if it so choose, or it may not if it otherwise prefers. If it does not fairly observe and keep within the requirements of the law, it should not claim the benefits which the law confers. To nearly comply with the law, or to come within hailing distance thereof, is not enough.

The court in that case denied the claim of the taxpayer that it was a personal service corporation upon the ground that one of the principal stockholders was not regularly engaged in the active conduct of the business, and, with regard to whether capital was a material income-producing factor, the court said:

> In this case a little over 5 per cent. of the income of plaintiff corporation, during the year 1919, was derived from interest, discount, and profits on moneys invested. Here again the corporation, being free to elect to comply with the law, has come, at least, dangerously near a violation thereof. If it

is to claim the privilege of a personal service corporation, it should keep free from investments which yield interest or profit. The capital here involved was not such as was necessarily incident to carrying on the corporate activities, but was free capital. In view of the rather small amount of the income from interest, discount, and profits, the courts might hesitate to deny personal service classification to the corporation on that ground, if otherwise its right to such classification was fairly shown. Here, where the right to such classification otherwise is not shown, the receipt of such interest, discount, and profits should not be ignored, and may be assigned for what it is worth as a further ground of opposition to plaintiff's claims.

In the opinion of the Board, it is immaterial whether the income derived from capital is produced by the use of that capital in the business in which the petitioner is primarily engaged. It is income within the definition of section 200 no less because it arises from investments or sale of assets. The Board is of the opinion that it was not the intention of Congress to grant to corporations personal service classification when capital is found to have produced during the year a substantial amount of income. Under the circumstances in this appeal, we believe that capital was a material income-producing factor within the meaning of the statute and that petitioner is not entitled to classification as a personal service corporation.

*Judgment will be entered on 15 days' notice, under Rule 50.*